***********
The undersigned reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Ledford. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, or rehear the parties or their representatives. Having reviewed the competent evidence of record, the Full Commission affirms the Opinion and Award of Deputy Commissioner Ledford with modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. On March 17, 2002 and January 27, 2003 the parties were bound by and subject to the North Carolina Workers' Compensation Act. *Page 2 
2. On March 17, 2002 and January 27, 2003, an employment relationship existed between plaintiff and defendant Mission Hospitals, Inc.
3. On March 17, 2002 and January 27, 2003, defendant was self-insured for claims arising out of the Workers' Compensation Act. Cambridge Integrated Services was and is its third party administrator for workers' compensation claims.
4. On March 17, 2002, plaintiff sustained compensable injuries to her low back and right shoulder arising out of and in the course of her employment.
5. Following a mediation conference on July 9, 2003, the parties entered into Form 21 and 26 agreements for payment of compensation in I.C. No. 228237, based in part on plaintiff's return to work on October 2, 2002 at the same or greater average weekly wage and a three percent permanent partial disability rating to her right arm. Those agreements were approved by the Commission on July 31, 2003.
6. On January 27, 2003, plaintiff sustained compensable injuries to her head and right shoulder arising out of and in the course of her employment.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff is 42 years of age with a date of birth of November 6, 1964. She graduated from high school and completed her nurses' training at A.B Technical Institute in 2000. Plaintiff was qualified and has been working as a registered nurse (R.N.) since that time.
2. Plaintiff suffered a compensable low back strain and right rotator cuff tear on March 17, 2002, arising out of and in the course of her employment. The employer accepted *Page 3 
plaintiff's claim as compensable pursuant to a Form 21 agreement, which was duly approved by the Commission.
3. On June 27, 2002, plaintiff underwent right shoulder surgery to repair her torn rotator cuff, which was performed by orthopedic surgeon, Dr. Angelo Cammarata.
4. As a result of her compensable injury of March 2002, plaintiff was out of work from March 18, 2002 through October 1, 2002, during which time she was paid compensation benefits at a rate of $552.85 per week based upon an average weekly wage of $829.28.
5. Plaintiff returned to work with defendant on October 2, 2000, in the neonatal unit (NICU). Plaintiff was able to perform her duties in NICU, until she sustained a second injury.
6. Plaintiff re-injured her right shoulder while working in defendant's neonatal intensive care unit on January 25, 2003 when she tripped and fell over a breast-feeding chair and struck her head and right shoulder on an unprotected corner of a cement wall.
7. As a result of the January 25, 2003 incident, plaintiff re-tore her right rotator cuff at the same location of her first injury, namely the insertion site of the supraspianatus tendon.
8. On February 18, 2003, plaintiff underwent her second right shoulder surgery to repair her re-torn rotator cuff, which was also performed by Dr. Cammarata.
9. The employer accepted plaintiff's head and right shoulder injury of January 2003 as compensable and paid plaintiff compensation benefits for her time lost from work due to these injuries.
10. An arthrogram performed on June 24, 2003 showed the rotator cuff was intact. Plaintiff returned to work for the employer on 12-hour shifts in July 2003. She initially returned with restrictions against lifting no greater than five pounds, no repetitive motion and no lifting higher than shoulder level. *Page 4 
11. Upon returning to work following her second shoulder surgery, plaintiff continued to experience pain and weakness in her right shoulder. She often wore heat or duralgesic patches on her shoulder to relieve her pain.
12. At her September 5, 2003 visit, plaintiff continued to complain of neck pain and bilateral upper extremity discomfort. Dr. Cammarata noted she was on full duty status.
13. At her September 29, 2003 visit, plaintiff reported to Dr. Cammarata that she was functioning quite well with limited use in the neonatal ICU. At this visit, Dr. Cammarata assessed plaintiff at maximum medical improvement with a four percent permanent impairment to her right arm pursuant to the AMA guidelines. However, pursuant to the North Carolina Industrial Commission guidelines, Dr. Cammarata indicated by deposition testimony that plaintiff has a ten percent permanent impairment rating. Therefore, the Full Commission finds that plaintiff has a ten percent permanent impairment rating.
14. Around this time, September 2003, plaintiff went out of work for surgical treatment of a non-work-related condition involving her thoracic spine. She remained out of work through December 2003.
15. Plaintiff testified that when she returned to work for the employer following recovery from her thoracic condition, she continued to experience pain, weakness and stiffness in her right shoulder, particularly after working 12-hour shifts. However, she did not return to see Dr. Cammarata until early April 2004.
16. Plaintiff returned to Dr. Cammarata on April 5, 2004, reporting continued complaints of pain and fatigue involving her shoulder. At that time, Dr. Cammarata was of the opinion that plaintiff's continuing complaints were due to chronic inflammation of the shoulder area, perhaps exacerbated by her thoracic surgery. He did not believe she had ruptured her repair *Page 5 
at that time. Dr. Cammarata administered an injection of lidocaine and dexamethasone into the subacromial space of plaintiff's right shoulder.
17. According to the testimony of a co-worker in NICU, Heather Stalker, which the undersigned finds credible, plaintiff reported to work on a Friday in late April or early May, 2004 with a bandage on her head or hand. When she asked plaintiff what had happened, plaintiff told Heather Stalker that she had been in a fight with another woman at a bar in Charlotte and had defended herself.
18. Plaintiff's own testimony at the hearing confirmed that she had been in a confrontation with another woman in a Charlotte bar/restaurant about the time described by Ms. Walker, although plaintiff denied that there was a physical altercation, and denied sustaining any injury. She admitted she had been seen in an emergency room in Charlotte, but denied any memory that she may have been treated for injuries sustained in a fight in a bar.
19. On May 10, 2004, plaintiff returned to Dr. Cammarata with continued complaints of pain in the shoulder region, which were affecting her activities of daily living as well as her work activities. Physical examination at that time revealed functional restricted range of motion, weakness and diffuse tenderness. Based upon his physical examination findings, Dr. Cammarata recommended an MR arthrogram, for which the defendant denied authorization.
20. Plaintiff's employment with defendant was terminated on May 24, 2004. In a Corrective Action Record received in evidence, the reasons for termination were identified by plaintiff's supervisor, Ginny Raviota as "Unacceptable behavior — Breaking Merit Standards regarding communication. On the weekend of May 7-9, 2004, plaintiff used obscene language that was witnessed by four co-workers. Also on that same weekend, used abusive language while caring for her patient." *Page 6 
21. Ms. Raviota testified, and the undersigned finds the same to be credible, that she was unaware that plaintiff was seeking approval for an arthrogram of her right shoulder at the time of her termination. Per Ms. Raviota's testimony, she had not previously terminated anyone for use of profanity at work. However, plaintiff's behavior over the three-day period at issue had been upsetting to other staff members.
22. Heather Stalker's credible testimony also establishes that plaintiff had acted inappropriately with one of the infants in NICU. Plaintiff was angry after a baby spit up on her face, and was yelling and cursing. Ms. Stalker intervened and took the baby from her so that plaintiff could clean up and calm down.
23. Following her termination, plaintiff returned to Dr. Cammarata on July 7, 2004, with ongoing complaints of shoulder pain. Dr. Cammarata's notes of that visit confirmed that since plaintiff's last visit of May 10, 2004, she had been seen for significant shoulder pain in an emergency room in Charlotte.
24. On June 10, 2004, plaintiff underwent an MR arthrogram of the right shoulder, which revealed a transmural tear of a portion of the supraspinatus tendon, as well as severe fraying and a complete tear along the posterior aspect of the supraspinatus tendon at the previously repaired site. Dr. Cammarata repaired that recurrent tendon tear in plaintiff's right shoulder in a third operation on August 18, 2004.
25. Dr. Cammarata testified in this matter, but his testimony was somewhat equivocal. Although he acknowledged that someone who has undergone two prior rotator cuff repairs is more prone to a reinjury or another tear, he did not testify that it was his opinion that is what happened in plaintiff's situation, or even that it was more likely than not what happened. *Page 7 
He further testified that it would be unusual for plaintiff to have a third rotator cuff tear absent some intervening trauma.
26. Dr. Cammarata's testimony overall fails to establish that it is more likely than not that plaintiff's third rotator cuff tear was the direct and natural consequence of her prior compensable injuries. This is particularly true in the light of the evidence that plaintiff had been in an altercation sometime in April or May 2004, around the time she returned to see Dr. Cammarata, with ongoing complaints of shoulder pain.
27. Subsequent to her termination, plaintiff's inability to locate or secure suitable employment and her inability to earn regular wages comparable to her pre-injury wage level was not related to her 2002 and 2003 injuries or any disability associated therewith.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. On March 17, 2002 and January 25, 2003, plaintiff sustained injuries by accident arising out of and in the course of her employment with defendant. N.C. Gen. Stat. § 97-2(6).
2. It is well established that "[t]he plaintiff in a workers' compensation case bears the burden of initially proving each and every element of compensability, including causation." Whitfield v. Lab. Corpof Am., 158 N.C.App. 341, 350, 581 S.E.2d 778, 784 (2003). The record must contain "competent evidence to support the inference that the accident in question resulted in the injury complained of. . . ."Click v Pilot Freight Carriers, Inc., 300 N.C. 164, 167, 265 S.E. 389,391 (1980). The greater weight of the evidence fails to support a conclusion that the plaintiff's compensable injuries in 2002 and 2003 caused her rotator cuff tear in 2004. *Page 8 
3. Plaintiff's employment with the defendant Mission Hospitals Inc. was terminated by the employer for misconduct or fault for which a non-disabled employee would also have been terminated and for reasons unrelated to her compensable injuries by accident. Seagraves v. AustinCo. of Greensboro, 123 N.C. App 228, 472 S.E.2d 587 (1996).
4. As a result of her second compensable injury to her right shoulder on January 25, 2003, plaintiff sustained an additional permanent impairment to her right arm of ten percent, entitling her to an additional 24 weeks of compensation at the rate of $552.85 per week. N.C. Gen. Stat. § 97-31(13).
5. Plaintiff argues that the Parsons presumption applies in this case and that there is a rebuttable presumption that plaintiff's third shoulder injury in 2004 is related to her compensable shoulder injuries in 2002 and 2003. According to the Parsons presumption to require plaintiff to re-prove causation each time she seeks treatment for the very injury that the Commission has previously determined to be a result of compensable accident would be unjust and a violation of the duty to interpret the Workers' Compensation Act in favor of plaintiff.Parsons v. Pantry, Inc., 126 N.C. App. 540, 485 S.E. 2d 867 (1997). However, in the case sub judice, plaintiff's rotator cuff tears resulted from three separate, distinct, injuries. Plaintiff's injuries were not ongoing conditions as in Parsons where there is a presumption of compensability in the future once the original injury is found to be compensable. Therefore, there is not a presumption that plaintiff's 2004 shoulder injury is related to her 2002 and 2003 compensable shoulder injuries.
6. Plaintiff did not sustain a third compensable injury by accident arising out of and in the course of her employment with defendant in 2004. N.C. Gen. Stat. § 97-2(6).
 *********** *Page 9 
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 AWARD
1. Plaintiff's claim for additional indemnity benefits and for medical compensation for her third rotator cuff tear discovered in 2004 must be and is hereby Denied.
2. Defendant shall pay plaintiff compensation at the rate of $552.85 per week for 24 weeks, a total of $13,268.40, for the additional impairment to her right arm from the second accident of January 27, 2003.
3. A reasonable attorney's fee of twenty-five percent of the $13,268.40 awarded to plaintiff shall be paid to her counsel.
4. Defendants shall pay the costs, including the expert witness fee of $1,200 previously approved for Dr. Cammarata.
This the 6th day of December, 2006.
S/___________________ BUCK LATTIMORE COMMISSIONER
CONCURRING:
 S/___________________ PAMELA T. YOUNG COMMISSIONER
 S/____________________ BERNADINE S. BALLANCE PGPage 10 COMMISSIONER *Page 1